**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

No. 22-11437-GG

---

FEDERAL ELECTION COMMISSION,

Plaintiff - Appellee,

v.

DAVID RIVERA,

Defendant - Appellant.

---

Appeal from the United States District Court
for the Southern District of Florida
No. 17-cv-22643

---

**APPELLANT'S BRIEF**

---

Jeffrey David Feldman
TRAILBLAZER
1200 Brickell Avenue
Penthouse 1900
Miami, FL 33131
Phone: 305.222.7851
Fax: 305.760.4193
jfeldman@trailblazerlaw.com

Thomas L. Hunker
Virginia Ashley Paxton
HUNKER PAXTON APPEALS & TRIALS
1 East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33301
Phone: 877.841.8808
Fax: 954.477.7313
thomas.hunker@hunkerappeals.com
ashley.paxton@hunkerappeals.com

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-3, I certify that the following are trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have/had an interest in the outcome of this appeal:

- Cannon, Aileen M. – United States District Court Judge

- Cooke, Marcia J. (deceased) – United States District Court Judge

- Deeley, Kevin – Counsel for FEC

- **Federal Election Commission ("FEC") – Plaintiff-Appellee**

- Feldman, Jeffrey D. – Counsel for Rivera

- Goodman, Jonathan – United States Magistrate Judge

- Hafeez, Sarah – Counsel for Rivera (withdrawn)

- Hunker, Thomas L. – Counsel for Rivera

- Hunker Paxton Appeals & Trials – Counsel for Rivera

- Kahn, Roy J. – Counsel for Rivera (withdrawn)

- Mueller, Greg J. – Counsel for FEC

- Paxton, V. Ashley – Counsel for Rivera

- **Rivera, David ("Rivera") – Defendant-Appellant**

- Siler, Jacob S. – Counsel for FEC (withdrawn)

- Stevenson, Lisa J. – Counsel for FEC

C-1

- Summers, Harry J. – Counsel for FEC

- Trailblazer – Counsel for Rivera

- Ward, Shaina – Counsel for FEC

Dated: June 14, 2023

Respectfully submitted,

/s/ Virginia Ashley Paxton
Virginia Ashley Paxton
*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Rivera requests oral argument to the extent it will assist the Court in resolving the issues presented in this appeal concerning the interpretation, application, and constitutionality of the Federal Election Campaign Act (FECA). Rivera requests a total of twenty minutes to present his argument.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement....………..C-1

Statement Regarding Oral Argument………………………………………………….i

Table of Contents…………………………………………………………………...ii

Table of Citations…………………………………………………………………..iv

Jurisdictional Statement………………………….…………………………………1

Statement of the Issues…………………………………………………………...2

Statement of the Case………………………………………………………………3

    The Federal Election Campaign Act (FECA)……………………………….5

    The Federal Election Commission (FEC)…………………….………….10

    The 2012 Election………………………………………………………..13

    FEC's Presuit Investigation………………………………………………...15

    FEC's Original Complaint…………………………………………………21

    FEC's Amended Complaint………………………………………………...23

    Cross-Motions for Summary Judgment……………………………………25

    Rivera's Motion to Dismiss for Lack of Subject Matter Jurisdiction………28

    Rivera's Post-Judgment Motion……………………………………………29

Summary of the Argument………………………………………………………...31

Argument…………………………………………………………………33

    I.    The trial court lacked subject matter jurisdiction because FEC did not establish that it was unable -- prior to litigation -- to correct or prevent a violation of § 30122 based on the "primary liability" theory asserted in its amended complaint…………..33

        A.    FEC's presuit notices, probable cause determination, and attempts at conciliation were based on the invalid "secondary liability" theory asserted in its original complaint…………………………………………………34

        B.    FEC illegally contacted, communicated, attempted to conciliate directly with Rivera rather than his designated counsel………………..………………………………..36

    II.    FEC failed to state a cause of action because it alleged that Rivera "made" the contributions in his own name to the Sternad campaign and § 30122 has nothing to do with making false reports to FEC…..…………………………………………38

    III.    The district court entered summary judgment for FEC based on hearsay, non-record material, and conflicting evidence………42

    IV.    Section 30109(a)(6)(C)'s 300–1000% enhanced civil penalty is unconstitutionally vague and excessive………………………44

    V.    The district court's $465,000 civil penalty is an unconstitutional excessive fine under the Eighth Amendment…………………48

Conclusion…………………………………………………………………...53

Certificate of Compliance…………………………………………………53

Certificate of Service………………………………………………………54

# TABLE OF CITATIONS

## FEC Cases

*Campaign Legal Ctr. v. FEC*,
    31 F.4th 781 (D.C. Cir. 2022)…………………………………...5 n.3, 6 n.8

*Cao v. FEC*,
    688 F. Supp. 2d 498 (E.D. La. 2010)………………………………5 n.6, 6 n.7

*FEC v. Friends of Jane Harman*,
    59 F. Supp. 2d 1046 (C.D. Cal. 1999)…………………………………....44

*FEC v. Kalogianis*,
    No. 8:06-cv-68-T-23EAJ, 2007 U.S. Dist. LEXIS 88139
    (M.D. Fla. Nov. 30, 2007)………………………………………………44, 51 n.34

*FEC v. NRA*,
    553 F. Supp. 1331 (D.D.C. 1983)…………………………………………1

\*  **FEC v. Swallow,**
    **304 F. Supp. 3d 1113 (D. Utah 2018)………………………………...passim**

*FEC v. Ted Cruz for Senate*,
    142 S. Ct. 1638 (2022)………………………………………50 n.32, 51 n.33

*FEC v. Toledano*,
    317 F.3d 939 (9th Cir. 2002)……………………………………….36 n.26

*McCutcheon v. FEC*,
    572 U.S. 185 (2014)……………………………………......................50 n.32

*RNC v. FEC*,
    76 F.3d 400 (D.C. Cir. 1996)…………………………….7 n.11-12, 8 n.13, 39

*RNC v. FEC*,
    619 F.3d 410 (5th Cir. 2010)…………………………………………….6 n.7

*Wagner v. FEC*,
    717 F.3d 1007 (D.C. Cir. 2013)…………………………………………1

**DOJ Cases**

*Fieger v. United States AG*,
    542 F.3d 1111 (6th Cir. 2008)……………………………………………….10

\* ***United States v. Curran*,**
    **20 F.3d 560 (3d Cir. 1994)…………………………………..5, 38, 42, 7 n.12**

*United States v. Hsia*,
    24 F. Supp. 2d 33 (D.D.C. 1998)……………………………..7 n.12, 8 n.14

*United States v. Hsu*,
    669 F.3d 112 (2d Cir. 2012)……………………………………………7 n.13

*United States v. O'Donnell*,
    608 F.3d 546 (9th Cir. 2010)……………….............................8 and n.15, 49

*United States v. Trie*,
    21 F. Supp. 2d 7 (D.D.C. 1998)…………………………………………….39

*United States v. Whittemore*,
    776 F.3d 1074 (9th Cir. 2015)……………………..........................8 n.14

**Other Cases**

*Arizona Right to Life PAC v. Bayless*,
    320 F.3d 1002 (9th Cir. 2003)……………………………………….51 n.33

*Bedoya v. Aventura Limousine & Transp. Serv., Inc.*,
    861 F. Supp. 2d 1346 (S.D. Fla. 2012)………………………………….38

*Boos v. Barry*,
    485 U.S. 312 (1988)…………………………………...…………51 n.33

*Buckley v. Valeo*,
    424 U.S. 1 (1976)………………………………………………..51 n.33

*Gonzales v. Madigan*,
    990 F.3d 561 (7th Cir. 2021)……………………………………..51 n.35

*Jones v. Markiewicz-Qualkinbush*,
    892 F.3d 935 (7th Cir. 2018)………………………...…………52 n.36

*Manley v. Law*,
    889 F. 3d 885 (7th Cir. 2018)………………………………………52 n.36

*Newsom v. Golden*,
    602 F. Supp. 3d 1073 (M.D. Tenn. 2022)………………………………..52

*Raila v. Cook Cnty. Officers Electoral Bd.*,
    No. 19 C 7580, 2021 U.S. Dist. LEXIS 215458
    (N.D. Ill. Nov. 8, 2021)……………………………………………52 n.36

*Reardon v. Danley*,
    No. 21-CV-2260, 2022 U.S. Dist. LEXIS 144883
    (C.D. Ill. July 6, 2022)……………………………………………..52 n.36

*Shrink Mo. Gov't PAC v. Maupin*,
    892 F. Supp. 1246 (E.D. Mo. 1995)………………………………..51 n.33

*Wisconsin Right to Life State PAC v. Barland*,
    664 F.3d 139 (7th Cir. 2011)………………………………………50 n.32

**Statutes**

\* 2 U.S.C. § 431   [52 U.S.C. § 30101]……………………………………..3, 5-6
   2 U.S.C. § 434   [52 U.S.C. § 30104]………………………..6 n.8-10, 7 n.11, 40, 42
   2 U.S.C. § 437d  [52 U.S.C. § 30107]……………………………………...10
\* 2 U.S.C. § 437g  [52 U.S.C. § 30109]…………………………………....passim
\* 2 U.S.C. § 441a  [52 U.S.C. § 30116]…………………………………….passim
\* 2 U.S.C. § 441f   [52 U.S.C. § 30122]…………………………………….passim
   2 U.S.C. § 441g  [52 U.S.C. § 30123]……………………………………...6, 40
   2 U.S.C. § 455   [52 U.S.C. § 30145]……………………………………...36 n.26

   18 U.S.C. § 2……………………………………………...…………passim
   18 U.S.C. § 371……………………………………………....15, 38, 40, 42
   18 U.S.C. § 1001……………………………………………...…15, 38-40, 42
   18 U.S.C. § 3282……………………………………………...…………36 n.26

28 U.S.C. § 530B.....................................................................................37
28 U.S.C. § 1291.......................................................................................1
28 U.S.C. § 1331.......................................................................................1
28 U.S.C. § 2462..............................................................................36 n.26

\* 52 U.S.C. § 30101  [2 U.S.C. § 431]..........................................3, 5-6
52 U.S.C. § 30104  [2 U.S.C. § 434].................6 n.8-10, 7 n.11, 40, 42
52 U.S.C. § 30107  [2 U.S.C. § 437d]......................................................10
\* 52 U.S.C. § 30109  [2 U.S.C. § 437g]..........................................passim
52 U.S.C. § 30116  [2 U.S.C. § 441a]...........................................passim
\* 52 U.S.C. § 30122  [2 U.S.C. § 441f].........................................passim
52 U.S.C. § 30123  [2 U.S.C. § 441g]..........................................6, 40
52 U.S.C. § 30145  [2 U.S.C. § 455].....................................36 n.26

Pub. L. 107-155, 116 Stat. 81 (2002)........................................13, 46 n.28

H.R. 8528, 117th Cong. § 354 (2022)........................................10, 41

**Regulations**

11 C.F.R. § 104.3..................................................................................6 n.8
11 C.F.R. § 104.13..............................................................................6 n.10
11 C.F.R. § 104.14..............................................................................7 n.11
11 C.F.R. § 109.20.....................................................................6 n.7, n.10
11 C.F.R. § 109.21.....................................................................6 n.7, n.10
11 C.F.R. § 109.23..................................................................................6 n.7
11 C.F.R. § 110.4..............................................................................passim
\* **11 C.F.R. § 111.23.........................................................11, 36-37**
\* **11 C.F.R. § 111.24.........................................................13, 22, 40**
11 C.F.R. § 114.12..............................................................................7 n.11

28 C.F.R. 77.3..........................................................................................37

43 Fed. Reg. 5441 (1978).......................................................................12
54 Fed. Reg. 34098 (1989).....................................................................21
79 Fed. Reg. 77841 (2014)..................................................................3 n.1
88 Fed. Reg. 24986 (2023).....................................................................12
88 Fed. Reg. 33816 (2023)...............................................................10, 12

FEC Office of General Counsel,
    (OGC) Enforcement Manual (June 2013)…………………………………..11

Office of the Law Revision Counsel,
    United States Code: Editorial Reclassification Table................................3 n.1

**Rules**

Fla. Bar R. 4-4.2…………..……………………………………………………37

S.D. Fla. Local R. 11.1……………………………………………………….38

FRAP 4………………………………………………………………...……1

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction to review the district court's final summary judgment in favor of FEC on its FECA claims. *See* [DE 48]; [DE 176]; [DE 163]; [DE 177]; [DE 191]; FRAP 4(a)(iv), (vi); 28 U.S.C. § 1291; 28 U.S.C. § 1331. This Court has also appellate jurisdiction to reverse the orders entered by the district court and remand for entry of an order dismissing the case for lack of subject matter jurisdiction. *See* 52 U.S.C. § 30109(a)(6); [DE 1 at 9]; [DE 32-1 at 9]; [DE 41 at 9]; *Wagner v. FEC*, 717 F.3d 1007, 1016-1017 (2013); *see also FEC v. NRA*, 553 F. Supp. 1331, 1341 n.3 (D.D.C. 1983).

# STATEMENT OF THE ISSUES

I.      Whether FEC established that it was unable to correct or prevent a violation of § 30122 based on a "primary liability" theory prior to litigation.

II.     Whether FEC failed to state a cause of action because it alleged that Rivera "made" the contributions in his <u>own name</u> to the <u>Sternad campaign</u> and § 30122 has nothing to do with making false reports to FEC.

III.    Whether the district court erred in entering summary judgment for FEC based on hearsay, non-record material, and conflicting evidence.

IV.     Whether § 30109(a)(6)(C)'s 300–1000% civil penalty is unconstitutionally vague and excessive.

V.      Whether the district court's $465,000 civil penalty is an unconstitutional excessive fine under the Eighth Amendment.

## STATEMENT OF THE CASE

In this FECA[1] civil enforcement action, the district court granted FEC's motion for final summary judgment, including its request for a declaratory judgment, a permanent injunction, and a record-breaking[2] $456,000 civil penalty, based on a finding that former U.S. Congressman David Rivera made campaign contributions "in the name of another person" in violation of FECA § 30122. *See* [DE 163]. The court found that Rivera violated FECA § 30122 by: (1) directing cash payments to vendors to produce and distribute materials for Justin Lamar Sternad's Democratic primary campaign; and (2) directing political consultant Ana Alliegro to direct Sternad to falsely report to the FEC that the vendor payments were made with loans from his personal funds to his campaign. *See* [DE 163]. The court also found that FEC complied with its jurisdictional presuit requirements under FECA § 30109 [DE 176] and denied Rivera's post-judgment motion challenging: (1) section 30109(a)(6)(C) as unconstitutionally vague and excessive; and (1) the $456,000 civil penalty as a punitive excessive fine in violation of the Eighth Amendment [DE 191].

---

1.  The Federal Election Campaign Act of 1971, as amended, 52 U.S.C. §§ 30101-45 (formerly 2 U.S.C. §§ 431-455) ("FECA"). On September 1, 2014, the provisions of FECA were transferred from Title 2 of the United States Code to new Title 52. *See* 79 Fed. Reg. 77841, 77842 (2014); Editorial Reclassification Table.

2.  According to FEC's website, the civil penalty imposed on Rivera was the largest civil penalty FEC has ever imposed on a non-corporate individual.

Rivera seeks reversal and remand for entry of dismissal because FEC alleged that Rivera "made" the contributions **in his own name to the Sternad campaign**, and FECA § 30122 has nothing to do with reporting to FEC. Further, FEC failed to establish compliance with the jurisdictional presuit requirements of FECA § 30109 because: (1) it sent presuit notices, made a probable cause determination, and attempted conciliation based on an invalid "secondary liability" theory that the district court rejected rather than the "primary liability" theory asserted in its staff attorneys' unauthorized amended complaint; and (2) it  illegally contacted, communicated, attempted to conciliate directly with Rivera rather than his designated counsel in violation of FEC's no-contact rule, district court rules, DOJ rules, and Florida Bar rules. Alternatively, Rivera seeks reversal and remand for trial because the district court entered summary judgment based on hearsay, non-record material, and conflicting evidence. Lastly, Rivera seeks reversal of the civil penalty because section 30109(a)(6)(C) as unconstitutionally vague and excessive on its face, and the $456,000 civil penalty as a punitive excessive fine in violation of the Eighth Amendment.

**The Federal Election Campaign Act (FECA)**

"Before 1972, federal campaign contributions were regulated by certain sections of Title 18 of the United States Code[.]" *United States v. Curran*, 20 F.3d 560, 564 (3d Cir. 1994). "Early that year, however, Congress enacted a comprehensive statute entitled the Federal Election Campaign Act of 1971 [FECA.]" *See id.* "The Act placed limits on the amount of money a person is allowed to contribute to a candidate for federal office" and "impose[d] comprehensive disclosure requirements."[3] "In 1974, Congress created the Federal Election Commission ('FEC' or 'the Commission') as an independent agency to civilly enforce FECA's monetary limits and disclosure requirements."[4]

In 2012, FECA limited individuals to an aggregate of $2000 (or $2500 indexed to inflation) in contributions per candidate per election.[5] "The Act's contribution limits apply both to direct contributions of money and in-kind contributions of goods or services."[6] "[A]ll contributions made by a person, either

---

3.    *FEC v. Swallow*, 304 F. Supp. 3d 1113, 1114 (D. Utah 2018); *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 784-85 (D.C. Cir. 2022); 52 U.S.C. § 30116.

4.    *Swallow*, 304 F. Supp. 3d at 1115.

5.    *See* 52 U.S.C. § 30116(a)(1)(A), (f); 74 Fed. Reg. 31345 (2009).

6.    *Cao v. FEC*, 688 F. Supp. 2d 498, 510 (E.D. La. 2010) (citing § 431(8)(A) [§ 30101(8)(A)]).

directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate [are] treated as contributions from such person to such candidate." § 30116(a)(8). "Expenditures made in coordination with a candidate or her campaign are considered in-kind contributions to the candidate."[7] FECA also limits cash contributions to $100 per candidate per election. *See* § 30123. "Political committees are required to publicly report all expenditures over $200."[8] "In addition, they must report contributions — in-kind, coordinated, or otherwise — made to any candidate."[9] "A candidate's 'authorized committee,' . . . must disclose all in-kind, coordinated contributions it receives as both contributions and expenditures, because these donations function as resources spent by the campaign in furtherance of the election of the candidate."[10] FECA "requires the **treasurer** of a political committee

---

7. *See Cao*, 688 F. Supp. 2d at 510 (citing § 441a(a)(7)(B) [§ 30116(a)(7)(B)]); 11 C.F.R. §§ 109.20(b); 109.21; 109.23; *Repub. Nat'l Comm. v. FEC*, 619 F.3d 410, 416 (5th Cir. 2010) ("[P]rearranged or coordinated expenditures are constitutionally equivalent to contributions"); *see also Goland v. United States*, 903 F.2d 1247, 1251 (9th Cir. 1990) ("Contributions include payment for goods and services, including media advertisements").

8. *Campaign Legal Ctr.*, 31 F.4th at 784-85 (citing § 30104(b)(5)(A); 11 C.F.R. § 104.3(b)(3), (4)).

9. *Id.* (citing § 30104(b)(4)(H)(i), (6)(B)(i), (iii)).

10. *Id.* (citing §§ 30101(6), 30104(b); 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b)).

to report to [FEC] the name, address, occupation, and employer of donors giving more than $200 in a single year."[11] "While political committees must exert best efforts to identify individual contributors from whom they receive contributions, the **contributors** themselves have **no duty** to disclose any identifying information to the political committees, including even their name."[12]

Further, FECA creates enhanced civil and criminal liability for three discrete types of "campaign finance fraud."[13] Specifically, § 30122 [§ 441f] states:

> No person shall **[1] make** a contribution in the name of another person or **[2]** knowingly **permit** his name to be used to effect such a contribution, **and** no person shall **[3]** knowingly **accept** a contribution made by one person in the name of another person.".

*Id.* (emphasis added). The two most common forms of such contributions are: (1) "false name" contributions; and (2) "conduit" (a/k/a "intermediary" a/k/a "straw donor") contributions. "A false name contribution occurs when a person contributes to a candidate but falsely attributes another person as the source of the contribution."

---

11.    *Repub. Nat'l Comm. v. FEC*, 76 F.3d 400, 403 (D.C. Cir. 1996) (emphasis added) (citing § 434(b)(3)(A) [now § 30104(b)(3)(A)]); 11 C.F.R. § 104.14(d); 11 C.F.R. § 114.12.

12.    *United States v. Hsia*, 24 F. Supp. 2d 33, 59 (D.D.C. 1998) (emphasis added); *Repub. Nat'l Comm.*, 76 F.3d at 403 ("Neither the Act nor any other law, however, requires **donors** to disclose this information.") (emphasis added); *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994)

13.    *United States v. Hsu*, 669 F.3d 112, 113 (2d Cir. 2012).

*Swallow*, 304 F. Supp. 3d at 1115; *United States v. O'Donnell*, 608 F.3d 546, 549 (9th Cir. 2010). "A conduit contribution reaches the same result when a person provides funds to another person (the conduit) who contributes the funds to the candidate. *Id.* "The status of the donated funds under state property law, at the time of their donation, [is] irrelevant to a determination of who 'made' the contribution . . . The key issue under [§ 30122] is the source of the funds[.]"[14] "The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient." § 30116(a)(8). (emphasis added). "There is **nothing** in the language of [§ 30116(a)(8)] to indicate that the provision was directed at the **disclosure concerns** of [§ 30122]."[15]

"In 1989, [FEC] decided to add a new regulation which for the first time declared that 'no person shall *knowingly help or assist* any person in making a contribution in the name of another." *Swallow*, 304 F. Supp. 3d at 1115 (emphasis in original):

(1) No person shall —

(i) **Make** a contribution in the name of another;

---

14.    *United States v. Whittemore*, 776 F.3d 1074, 1080 (9th Cir. 2015); *Hsia*, 24 F. Supp. 2d at 60.

15.    *O'Donnell*, 608 F.3d at 554 (emphasis added) ("Although [§ 30116(a)(8)] does not place reporting obligations on the original source, that source could violate [§ 30116(a)(1)(A)] by exceeding the individual contribution limit.").

(ii) Knowingly **permit** his or her name to be used to effect that contribution;

(iii) Knowingly **help or assist** any person in making a contribution in the name of another; or

(iv) Knowingly **accept** a contribution made by one person in the name of another.

11 C.F.R. § 110.4(b) (emphasis added). "In its 'interpretive guidance' for the new regulation, [FEC] explained that it applies to: those who **initiate** or **instigate** or have some significant **participation** in a **plan** or **scheme** to make a contribution in the name of another, including those who **solicit** or act as **go-betweens** to third parties whose donations are reimbursed." *Swallow*, 304 F. Supp. 1113 (quoting 54 Fed. Reg. at 34, 104-05 (1989)) (emphasis added). "Thus, for the first time, **secondary actors**, what the criminal law calls '**aiders** and **abettors**,' and what the new regulation calls '**helpers** and **assisters**,' were brought into the realm of persons who face civil liability under FECA." *Id.* (emphasis added).

In 2018, the Utah District Court, in *FEC v. Swallow*, 304 F. Supp. 1113 (D. Utah 2018), enjoined FEC from enforcing the "helpers and assisters" regulation and ordered FEC to strike it from the Code of Federal Regulations as improperly expanding the scope of § 30122. The court reasoned that "FECA had no authority to write a regulation that went beyond the Act itself." *Id.* The court also noted "that section 30122 already includes, in addition to civil penalties, the possibility of criminal felony charges." *Id.* "In contrast to the civil penalties under section 30122,

in a section 30122 criminal case, **secondary actors**—those who **aid and abet** the person who illegally makes a contribution in the name of another . . . are subject to criminal liability." *Id.* "This is because the United States **criminal code**, 18 U.S.C. § 2, specifically makes such secondary actors 'punishable as a **principal**.' " *Id.* (emphasis added).

In 2022, some representatives of Congress proposed a bill to add secondary liability language to § 30122, but the bill never made it out of committee. *See* 117 H.R. 8528, 117th Cong. § 354 (2022) (proposing to amend § 30122 to add: "No person shall knowingly **direct**, **help**, or **assist** any person in making a contribution in the name of another person.") (emphasis added).

On May 25, 2023, FEC repealed 11 C.F.R. § 110.4(b)(1)(iii). *See* 88 Fed. Reg. 33816 (2023) ("The Commission is removing the regulatory prohibition on knowingly helping or assisting any person in making a contribution in the name of another . . . to implement . . . *Swallow*, which enjoined the Commission from enforcing the provision and ordered the Commission to strike it from the [C.F.R.]."

**The Federal Election Commission (FEC)**

"FEC has exclusive jurisdiction with respect to the civil enforcement of the Act." *Fieger v. United States AG*, 542 F.3d 1111, 1114 (6th Cir. 2008); 52 U.S.C. § 30107(e). "In exercising its civil enforcement power, the FEC may issue subpoenas, administer oaths, render advisory opinions regarding compliance with the Act, and

litigate civil actions through its general counsel." *Id*. "[T]he enforcement process contains several stages, and a matter cannot proceed to the next stage unless at least four Commissioners vote to proceed." *See* OGC Enforcement Manual at 16 (June 2013). If FEC receives a complaint or ascertains information in the normal course of carrying out its supervisory responsibilities and determines by vote that it has "reason to believe" that a person has violated FECA, FEC must "notify" the person of the alleged violation and the "factual basis" and must investigate the alleged violation. § 30109(a)(2). The first notice "includes a designation of counsel (DOC) form on which respondents may identify the counsel representing them in the matter. *See* OGC Enforcement Manual at 11. "Once a respondent designates counsel, Enforcement attorneys and staff should communicate only with that counsel." *Id*. "Upon receipt of a letter of representation, [FEC] shall have **no contact** with respondent except through designated counsel unless authorized in writing by respondent." 11 C.F.R. § 111.23 (emphasis added).

FEC is also required to notify the respondent of any recommendation from its General Counsel to the Commission to find probable cause to believe that a violation occurred. The notice must be accompanied by General Counsel's Brief analyzing the legal and factual issues of the case. § 30109(a)(3). The respondent then has 15 days to submit a reply brief stating the respondent's factual and legal position. *Id*. If FEC determines by vote of 4 of its members that there is probable cause to believe

that a person has violated FECA, FEC is required to attempt, for a period of at least 30 days but not more than 90 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved. § 30109(a)(4). FEC may enter into a conciliation agreement with the respondent based on a vote of 4 of its members. *Id.* A conciliation agreement, unless violated, is a complete bar to any further action by FEC, including the bringing of a civil proceeding. *Id.* If FEC believes that a FECA violation has been committed, the conciliation agreement may require the person to pay a civil penalty. § 30109(a)(5).

"FEC and Attorney General retain concurrent jurisdiction to investigate criminal matters." *Bialek v. Mukasey*, 529 F.3d 1267, 1271 (10th Cir. 2008). "If [FEC] by vote of 4 of its members finds probable cause to believe that a knowing and willful violation of [FECA] has occurred or is about to occur, it may refer [the matter] to the Attorney General," 52 U.S.C. § 30109(a)(5)(C), "without regard to any limitations set forth in the paragraph regarding conciliation agreements." *Marcus v. Holder*, 574 F.3d 1182, 1185 (9th Cir. 2009). "[A]fter reporting a matter to the Justice Department," FEC may "continue to pursue its own civil investigation of the matter." *Spannaus v. Fed. Election Com.*, 641 F. Supp. 1520, 1532 (S.D.N.Y. 1986); *see also Memorandum of Understanding Between DOJ and FEC*, 43 Fed. Reg. 5441 (1978), superseded at 88 Fed. Reg. 24986, 24987 (2023).

If FEC is unable to correct or prevent any FECA violation by informal methods, it may—by vote of 4 of its members—institute a civil action for injunctive or other relief, including civil penalties. § 30109(a)(6). Generally, the **maximum** civil penalty is the greater of $5,000 or the amount of the illegal contribution. § 30109(a)(6)(A). Where the violation was "knowing and willful," the **maximum** civil penalty is the greater of $10,000 or double the amount of the illegal contribution. § 30109(a)(6)(C); 11 C.F.R. § 111.24. FECA also provides criminal penalties for "knowing and willful" violations that involve "the making, receiving, or reporting of any contribution, donation, or expenditure." § 30109(d).

In 2002, Congress added a penalty enhancement specifically for "knowing and willful" violations of § 30122. *See* Pub. L. No. 107-155, 116 Stat. 81 (2002). For such violations, the 2002 amendments created a mandatory minimum **civil penalty** of triple (300%) and a maximum civil penalty of the greater of $50,000 or ten times (1000%) the amount of the illegal contribution. *See* § 30109(a)(6)(C). The Act also provides for an identical 300–1000% **criminal fine** for "knowing and willful" violations of § 30122. *See* § 30109(d)(1)(D). It also provides for imprisonment up to 5 years for § 30122 violations depending upon the amount of the aggregate illegal contributions. *See* § 30109(d)(1)(A), (D).

**The 2012 Election**

In October 2011, Sternad filed forms with FEC declaring himself a candidate for the newly redrawn 26th Congressional District ("District 26").[16] In April 2012, political consultant Ana Alliegro contacted Sternad and offered financial and strategic support."[17] Sternad agreed, and Alliegro swung into action, giving him a cell phone, renting him a car, and directing all aspects of his campaign strategy, including selecting and paying vendors for print advertising and bulk mailing services for the campaign. In short, Alliegro "was calling the shots [f]or [Sternad's] campaign," including selecting and changing drop dates for mailing Sternad's demographically targeted campaign advertisements.[18]

In August 2012, after Sternad's mass mailings went out, a reporter from the *Miami Herald* contacted Sternad and asked how he financed the mass mailings and why Sternad as "treasurer of record" for his campaign did not disclose the vendor payments on his FEC reports. [DE 142-8 at 18]. The *Miami Herald* also began reporting on Sternad's apparent campaign-finance violations and suggesting that Rivera was involved. [DE 171-5 at 5-6, 9-10]. After speaking to Alliegro, Sternad

---

16.    [DE 140-4 at 2; 142-8 at 6-7, 142-28 at 14].

17.    [DE 140-1 at 11; 142-8 at 3, 9, 142-28 at 16-17].

18.    [DE 142-28 at 20, 32-33; 142-32 at 19-20].

amended his FEC reports and falsely reported that he made loans from his personal funds to pay the vendors.[19] On August 14, 2012, the Democratic primary was held, and Sternad lost to Garcia who went on to defeat Rivera in the general election. [DE 171-5 at 5 and n.5; 172-1 at 34].

**FEC's Presuit Investigation**

In October 2012, FEC received a complaint that Sternad violated the Act from Roland Sanchez-Medina, who was a high school and law school classmate of Garcia and also a plaintiff in litigation challenging the creation of District 26. [DE 171-5 at 4 n.1, 6; 172-1 at 20]. Sternad was eventually interviewed by the Department of Justice (DOJ) and asked to cooperate in an investigation against Rivera. [DE 142-8 at 18]. In March 2013, Sternad pled guilty to: (1) conspiracy under 18 U.S.C. § 371; (2) making false statements under 18 U.S.C. § 1001(a)(2); and (3) accepting illegal campaign contributions under §§ 30116(a)(1)(A), (f), and 30109(d)(1)(A)(i). [DE 171-4 at 12; 171-5 at 7 n.13-14]. In January 2014, Sternad submitted amended FEC reports listing the source of each contribution as "UNKNOWN CONTRIBUTOR," together with cover letters stating: "I have no knowledge as to the original source of the funds." [DE 142-43, 142-44]. Sternad stated in the cover letters that the in-kind contributions were "paid directly" to Expert Printing and Rapid Mail "by Ana Alliegro and/or David Rivera." *See id.* At his July 10, 2014 sentencing, Sternad took

---

19.      [DE 142-10; 142-11; 142-12; 142-28 at 22; 142-42; 171-5 at 5].

responsibility for his false statements to FEC, but claimed he was taken advantage of by Alliegro and Rivera. *See* [DE 142-45 at 4-5] ("I started out this campaign with the best intentions. . . . I apologize . . . . I could have stopped this but instead I chose not to").

In April 2013, FEC sent Rivera a letter advising it found "reason to believe" Rivera violated FECA "[b]ased on Sternad's admission and the identification of Rivera as one of the co-conspirators[.]" [DE 171-4 at2-3; 171-5 at 4, 11-12]. On September 11, 2013, FEC sent Rivera another letter advising it found "reason to believe" Rivera knowingly and willfully violated FECA and that Rivera could submit a response and engage in pre-probable cause conciliation. [DE 171-5 at 2]. The letter enclosed a blank "Statement of Designation of Counsel" form. *See* [DE 172-1 at 14]. On September 25, 2013, Rivera's attorney, Yesenia Collazo, Esq., responded with a letter attaching the completed designation of counsel form. *Id.* at 10–12. Collazo informed FEC that Rivera denied FEC's allegations and requested a copy of a document cited by FEC. *Id.* After forwarding Collazo its April 2013 letter and attachments, FEC ceased all communication for over 3 years.

In August 2014, Ana Alliegro accepted a guilty plea for: (1) conspiracy to make a false statement and to violate FECA; (2) making a false statement; and (3) illegal campaign contributions. [DE 142-28 at 24]. AUSA Thomas Mulvihill read into the record a lengthy factual basis, and Alliegro confirmed there was sufficient

basis to convict her of the allegations. *Id.* at 23. In December 2014, AUSA Mulvihill called Alliegro back to court to testify before a grand jury investigating whether there was probable cause to pursue criminal charges against Rivera related to the 2012 Sternad campaign. [DE 142-5]. During her grand jury testimony, Alliegro stated that Rivera "instructed" her to contact Sternad and "ordered" her to finance Sternad's campaign. *Id.* at 13-14. She also stated that Rivera provided her cash to pay for the graphic designer and the printing and mailing of the fliers. *Id.* at 22, 26-27, 30-32. Alliegro stated that Sternad was aware of where the money came from and that Rivera was involved in the financing. *Id.* at 44. Alliegro further testified that "[a]fter speaking with David the only thing that I advised Mr. Sternad to do was to report it as a personal loan and then go ahead and amend it later because David supposedly had another plan of how he was going to take care of all this. . . . Mr. Rivera thought if we did this and called it a loan the media would get off of it and it would all go away, that did not happen." *Id.* at 33-35. In June 2017, Alliegro filed a complaint with the Florida Bar against AUSA Mulvihill for engaging in "corrupt, improper and potentially illegal acts." [DE 147-5 at 2]. With her complaint, Alliegro provided a sworn statement describing conduct by Mulvihill in coercing her guilty plea and grand jury testimony. *Id.* at 4-9. Alliegro also filed a complaint with the DOJ's Office of Professional Responsibility including the same sworn allegations against Mulvihill. [DE 147-6].

On June 22, 2016, Rivera submitted a financial disclosure form to the Florida Division of Elections in connection with his intention to run for state office. *See* [DE 142-37]. Soon thereafter, FEC resumed its 2013 efforts (long-dormant) against Rivera. *See* [DE 172-1 at 2]. FEC claimed that "[d]uring the weeks of October 24 or October 31, 2016, [it] attempted to reach Rivera's designated counsel [Collazo] by phone, email, and mail to set up a telephone interview of [Rivera]." *Id.* On November 7, 2016, an FEC attorney "called Rivera at his home number listed on the designation of counsel form . . . to confirm whether Ms. Collazo continued to represent him on the enforcement matter." *Id.* at 2-3, 18. On November 10, 2016, Collazo returned FEC's call and left a voicemail message apologizing for the delay in returning FEC's call. *Id.* at 2. FEC claimed that it returned Collazo's call and left voicemail messages between November 14 and November 21, 2016, but "was still unable to reach her[.]" *Id.* On November 22, 2016, FEC's attorney sent a letter to Collazo asking "to schedule a telephone interview" with Rivera and indicated that FEC might "issue a subpoena for a deposition" and asked Collazo to advise "if she was no longer representing Rivera in the enforcement matter." *Id.* at 3, 19.

On December 1, 2016, Rivera returned the phone call from FEC's attorney to him. *See* [DE 172-1 at 3]. During the call, FEC's attorney "explained that [FEC] was working to complete the investigation in the enforcement matter and that [it] wanted to schedule a phone interview with him" "as a witness to events[.]" *Id.* at 3, 21. FEC

18

told Rivera that the reason it had not contacted him in over 3 years was due to "press reports" citing the "possible existence of other investigative activities." *Id.* at 21. On December 2, 2016, FEC's attorney contacted Rivera directly again by email requesting an interview and asking him to confirm whether he would be representing himself or would continue to be represented by Collazo or another attorney. *Id.* at 3, 23. On December 8, 2016, Rivera responded to FEC's December 2, 2016 email quoting from Collazo's September 25, 2013 letter and requesting additional documents. [DE 172-1 at 21-22]. Rivera did **not** indicate in his response to FEC's December 2, 2017 email that he was representing himself or that Collazo was no longer representing him. *See* [DE 172-1 at 20-23]. On December 16, 2016, FEC sent a letter to Rivera (not Collazo) with a subpoena and order requiring him to provide information "under oath" within 30 days. [DE 172-1 at 24-30]. The request asked Rivera to state whether he provided any of his "own personal funds" or had any role in providing funds belonging to "any other individual or entity" to Sternad or his campaign in 2012 and to provide details and documents reflecting any such transactions. *Id.* at 27-28. It also asked Rivera to state whether he provided instructions to Sternad about how to disclose the funds in his FEC reports. *Id.* at 29.

On April 28, 2017, FEC's General Counsel sent a letter directed to Rivera (at an address in Doral, Florida, but the UPS tracking information stated that it was sent to an undisclosed address in "WASHINGTON, DC, US" where it was refused and

returned to sender. [DE 172-1 at 31, 48–49]. The letter advised that the General Counsel intended to recommend that FEC find probable cause to believe that Rivera violated FECA and enclosed a copy of the General Counsel's Brief. *Id.* The letter further advised that Rivera had 15 days to file a response brief and request an oral hearing before the Commission. *See id.* The same day, an FEC attorney communicated directly with Rivera by email, attaching a copy of the General Counsel's probable cause recommendation and Brief. *Id.* at 47. The Brief recommended that FEC find probable cause to believe that Rivera "knowingly and willfully helped or assisted" in making a contribution in the name of another in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b)(1)(iii).[20] On May 25, 2017, FEC's attorney sent another letter directly to Rivera indicating that FEC did not receive a response to the April 28, 2017 letter and intended to proceed with its recommendation to FEC to find probable cause. *Id.* at 51–52. On June 2, 2017, FEC sent a letter to Rivera, advising that FEC found probable cause. *Id.* at 53. The letter stated that it enclosed a proposed "Conciliation Agreement" that FEC "approved in settlement of this matter." *Id.* The Conciliation Agreement proposed a civil penalty

---

20.    *See* [DE 172-1 at 46]. ("Although the Committee's amended disclosure reports state that the sources of contributions are unknown, there is no dispute that Rivera **assisted** in the making of contributions in the name of another given that he **orchestrated** the **scheme** to secretly funnel contributions to Sternad's campaign that were initially falsely disclosed as personal loans from the candidate.") (emphasis added).

of $423,000 which was "600% of the amount in violation that still remains within the statute of limitations (i.e., $70,485.20)[.]" [DE 171-7 at 6-8]. The Conciliation Agreement also required Rivera to stipulate to a long list of self-incriminating statements and that Rivera's acceptance was subject to FEC approval. *Id.* On June 26, 2017, FEC's attorney again contacted Rivera directly (not through Collazo) by cell phone and informed Rivera that she "had been trying to reach him to discuss the proposed conciliation agreement" and "asked if he was interested in negotiating an agreement." [DE 172-1 at 56].

**FEC's Original Complaint**

On July 14, 2017, FEC filed its original complaint against Rivera. *See* [DE 1]; [DE 171-9]. FEC alleged that it "satisfied all of the jurisdictional requirements in the FECA that are prerequisites to filing this action." *See* [DE 1 at 8-9]. FEC further alleged that "Rivera knowingly and willfully violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b)(1)(iii) by making contributions in the name of another when he caused, directed, and assisted in the making of contributions in the name of others to . . . Sternad's 2012 primary campaign[.]" *Id.* at 9 (emphasis added). FEC quoted 54 Fed. Reg. 34098, 34105 (1989) to allege that a person "help[s] or assist[s]" by "initiating or instigating or having some significant participation in a plan or scheme to make a contribution in the name of another[.]" *Id.* at 1 (emphasis added). According to the original complaint: "[U]pon Alliegro's instructions, Sternad

21

concealed the source of the contributions by falsely reporting them as loans from his personal funds to the Sternad Committee." [DE 1 at 7] (emphasis added). FEC sought declaratory and injunctive relief and a "civil penalty" between 300% and 1000% of the amount of the alleged contributions pursuant to § 30109(a)(6)(C) and 11 C.F.R. § 111.24(a)(2)(ii). *See id.* at 1, 10.

Rivera moved to dismiss FEC's original complaint for failure to state a claim pursuant to Rule 12(b)(6) because it alleged that Rivera openly "made" the alleged payments to the vendors he worked with on his own campaign, that Sternad accepted the contributions with the understanding that they were from Rivera, and the allegations regarding Sternad's false reports to FEC were irrelevant because § 30122 does not address "aiding and abetting" or "making false statements" to FEC. [DE 17 at 4-5]. In its response, FEC denied alleging that Rivera was the "true source" of funds in a conduit scheme involving straw donors. *See* [DE 20 at 2, 5, 12-16]. Instead, FEC invoked 11 C.F.R. § 110.4(b)(1)(iii) and argued that Rivera made a "false name" contribution by knowingly "helping or assisting" Sternad in "accepting" a contribution and "having Alliegro recruit Sternad and direct him to falsely attribute his own name to the contributions in his FEC reports." *See id.* at 17-18.

On April 6, 2018 (after briefing but before ruling on the motion to dismiss), the District of Utah issued its decision in *FEC v. Swallow*, 304 F. Supp. 3d 1113,

1115 (D. Utah 2018) enjoining FEC from enforcing 11 C.F.R. § 110.4(b)(1)(iii) and ordering FEC to strike it from the Code of Federal Regulations because it improperly attempted to create a violation for "helping an assisting" violations of § 30122.

Subsequently, the district court entered an order dismissing FEC's complaint based on *Swallow*. [DE 31 at 4] ("*Swallow* is fatal to the FEC's claim against Rivera."). The court rejected FEC's attempt [DE 30 at 2] to argue that its original complaint alleged both "primary" and "secondary" liability against Rivera. *See* [DE 31 at 5]. Accordingly, the court dismissed the case, denied all pending motions as moot, and ordered the Clerk to close the case. *Id.* at 5.

**FEC's Amended Complaint.**

Thereafter, FEC's staff attorneys (without authorization or approval from the Commissioners) moved to reopen the case and for leave to file an amended complaint accusing Rivera of direct (rather than secondary) liability under § 30122. [DE 32]. To circumvent the trial court's dismissal, FEC altered its factual allegations by eliminating all references to the "scheme" and alleging instead that Rivera personally "provided" the contributions to Sternad's campaign. *See* [DE 32 at 7-8]; [DE 32-1]; [DE 41]. According to the amended complaint, "Alliegro spoke with Sternad and offered to transmit **Rivera's funds** to Sternad's campaign, to which **Sternad agreed**." [DE 41 at ¶ 15] (emphasis added). The amended complaint further alleged that Rivera "delivered cash" or "arranged for cash he controlled to be

23

delivered vendors providing services to the campaign" and "pa[id] vendors in cash to produce and distribute materials for Sternad's campaign" and "conceal[ed] his involvement and the source of the contributions." [DE 41 at 1, 4-6]. Also, unlike the original complaint—alleging that Sternad falsely reported certain contributions as loans from his personal funds "upon Alliegro's instructions"—the amended complaint alleged that Sternad was "[f]ollowing instructions from Rivera that were conveyed by Alliegro" when he made the false reports. *Compare* [DE 1 at 7] *with* [DE 41 at 6].[21] FEC alleged that "Rivera made the contributions described in paragraphs 13 to 19 for the purpose of influencing the 2012 Democratic primary election for Florida's 26th Congressional District and ultimately enhancing his own prospects in the 2012 general election. [DE 41 at ¶ 1]. According to FEC, supporting the Sternad campaign "aided Rivera's own election efforts by opposing Joe Garcia during his primary election. Garcia was the candidate Rivera was likely to — and did — ultimately face in the general election." *Id.* at ¶24.

After the Court granted FEC's motion to reopen and amend. [DE 40], Rivera moved to dismiss the amended complaint for failure to state a cause of action for violation of § 30122 because FEC alleged: (1) that Rivera "made" the payments to the vendors in his own name; and (2) that Sternad (as candidate and campaign

---

21. For a more detailed comparison of the two versions of FEC's complaint, see [DE 171-17].

treasurer) knew Rivera was the one who "made" the payments (i.e., the source). *See* [DE 42 at 4]. FEC alleged that Rivera hired the same vendors for Sternad that he used on his own campaign and that Sternad and the vendors all believed the money was coming from Rivera. *See id.* at 4–5. FEC filed a response, and the Court held a hearing and entered an order denying the motion to dismiss. *See* [DE 43]; [DE 48]; [DE 49 at 33-34]. Thereafter, Rivera filed an answer denying the allegations of the amended complaint and demanding a jury trial. [DE 50].

**Cross-Motions for Summary Judgment**

Following discovery, both parties moved for summary judgment. [DE 139]; [DE 142]. FEC argued in its Motion that "Rivera was the principal of the scheme to falsify the true source of the contributions to the Sternad campaign as well as the source of the funds, and thereby violated § 30122." [DE 142 at 14] (emphasis added). FEC cited a lot of circumstantial evidence, but the only evidence from an individual claiming to have personal knowledge that Rivera was the source of the money or that  the idea to report the payments as loans was the transcript of Alliegro's grand jury testimony. [DE 142].

On August 22, 2020, Rivera filed his Response to FEC's motion for summary judgment. [DE 146]. With his response, Rivera filed a February 14, 2019 Declaration of Alliegro [DE 147-7] together with copies of her June 2017 complaints to DOJ and the Florida Bar against AUSA Mulvihill [DE 147-5]; [DE 147-6]. In her Declaration,

Alliegro stated that the allegations in the amended complaint were false, including the allegations about Rivera instructing her to transmit funds to the Sternad campaign and directing her to instruct Sternad to falsely report the payments as loans from his personal funds to his campaign. *See* [DE 147-7].

Rivera also filed the transcript of Sternad's deposition. [DE 140-1]; [DE 142-8]; [DE 147-1]. At deposition, Sternad testified that he had never seen, met, or communicated with Rivera prior to his deposition and had no knowledge of Rivera personally making any donations or paying any vendors for services to his campaign. [DE 142-8 at 5-6, 18-19]. Sternad further testified that Rivera never directed him to mark any contributions as "loans" to his campaign from his personal funds and never directed him with respect to preparing or amending his FEC reports. *Id.* at 12, 14, 19–20. Sternad explained that he only communicated with Alliegro and that Alliegro directed him to falsely list certain contributions as loans to his campaign in his FEC reports.[22] Sternad testified that Alliegro never told him she was working with Rivera, but she told him that Rivera donated to his campaign and that the mailers, printing, rental car, and qualifying fee were being "taken care of" by Rivera. *See id.* at 16-17, 19, 22-23. Sternad understood Alliegro's statement to mean that Rivera deposited

---

22.    *See* [DE 142-8 at 8-9, 11, 15-16, 20] ("**She** directed me" and "I did what **she** directed.") (emphasis added).

money into his campaign account to pay expenses. *Id.* at 19. According to Sternad, "[m]y only basis of what I know is what [Alliegro] told me." *Id.* at 18.

Rivera also filed the transcript of the deposition of John Borrero, owner of Rapid Mail. [DE 140-2; 142-32]. Borrero did not know whether Rivera was the source of the money, but "assum[ed]" that "the funds were coming from" Rivera because Rivera "knew about" the money, assured Borrero that "it's going to be there," and told Borrero "[d]on't worry about it." *Id.* at 20-21. Alliegro never told Borrero that the money was from Rivera. *See id.* at 21. Rivera also filed his own affidavit affirming that he never met or communicated with Sternad, did not contribute to his campaign, and did not instruct him (directly **or** through Alliegro) to falsely report the source of contributions in his FEC reports. [DE 140-4].

On February 23, 2021, the court entered an order granting FEC's motion for summary judgment and concluding as a matter of law: (1) that Rivera "knowingly and willfully" violated section 30122 of the Federal Election Campaign Act by making contributions in the name of others, 52 U.S.C. § 30122 (formerly 2 U.S.C. § 441f); 11 C.F.R. § 110.4(b)(1)(i); and (2) that FEC's civil penalty in the amount of $456,000 was appropriate and should be imposed on Rivera. *See* [DE 163 at 34–39]. On the liability issue, the court inferred from Alliegro's grand jury testimony and plea colloquy that Rivera directed her to direct Sternad to falsely report on his FEC

disclosure forms that he paid the vendors for printing and shipping campaign materials with loans from his personal funds. *See id*.

On the civil penalty, the court did not conduct an evidentiary hearing to evaluate the amount and instead determined that "Rivera has the ability to pay a $465,000 fine" based on: (1) a disclosure statement that Rivera submitted to qualify for the 2016 election reflecting what his self-reported net worth was seven years ago; (2) unsubstantiated allegations from a pleading in a separate lawsuit in New York about revenue that Rivera's business allegedly received in the past; and (3) the court's independent review of the Florida Division of Corporations website. *See* [DE 142–37, 163–164]. The court also concluded that the alleged FECA violations "injured the public" by depriving the electorate of accurate information regarding Rivera's role in financing Sternad's campaign and eroding and undermining the public's confidence in its representative democracy. *See* [DE 163].

**Rivera's Motion to Dismiss for Lack of Subject Matter Jurisdiction**

On March 31, 2021, Rivera moved to dismiss for lack subject-matter jurisdiction because: (1) FEC's presuit notices, probable cause determination, and attempts at conciliation were based on the invalid "secondary liability" theory asserted in its original complaint; and (2) FEC illegally contacted, communicated, attempted to conciliate directly with Rivera rather than his designated counsel. *See* [DE 171 at 17-20; 174 at 7-10]. In opposition, FEC admitted that it sent all the

required administrative notifications directly to Rivera, but claimed that it didn't need to send notice to Rivera's attorney because it sent notice to Rivera himself. FEC also argued that its presuit notice, probable cause determination, and conciliation attempts were sufficient because they involved the same transactions and statutory violations as those alleged in its amended complaint. [DE 172 at 10–18]. Ultimately, the district court entered an order denying Rivera's motion to dismiss for lack of subject matter jurisdiction. [DE 176].

**Rivera's Post-Judgment Motion.**

Subsequent to the district court's order on jurisdiction, this Court issued its opinion in *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. Dec. 29, 2021), analyzing a statutory civil penalty under the False Claims Act (FCA) pursuant to the three-factor test previously applied in the criminal forfeiture context under the Excessive Fines Clause of the Eighth Amendment of the United States Constitution.

After the district entered final judgment [DE 177], Rivera moved to alter or amend or for relief from judgment pursuant to Rule 59(e) and 60(b), asking the district court to: (1) vacate its final judgment and civil penalty; (2) strike the 300–1000% penalty enhancement provision of 52 U.S.C. § 30109(6) as unconstitutionally vague and excessive; and (3) reconsider its analysis under *Yates* and determine that the amount of the fine requested by FEC was unconstitutionally

excessive. [DE 179]. FEC filed its written response on May 23, 2022, and Rivera filed a reply on June 10, 2022. [DE 186; 189].

On April 29, 2022, Rivera filed a notice of appeal of the Final Judgment. [DE 181]. On March 31, 2023, the district court entered an order denying the Motion to Alter or Amend Judgment, [DE 191]. The court rejected Rivera's Eighth Amendment challenge as "untimely" on the grounds that his prior counsel failed to oppose FEC's claim to a $456,000 fine at the summary judgment stage. *See* [DE 191]. The court also determined that it acted within its "discretion" in choosing a civil penalty at 600%[23] of the amount of the alleged illegal contributions because this was within the 300–1000% range set by Congress in FECA § 30109(a)(6)(C) and because the court applied the 9th Circuit's *Furgatch*[24] factors used in other FECA cases. *See* [DE 191].

Rivera's amended notice of appeal followed. [DE 193].

---

23.    FEC's original complaint claimed violations based on **$69,426.20** in alleged contributions that were allegedly made within five-year statute of limitations (i.e., between July 14, 2012 and August 9, 2012). *See* [DE 1 at 5-6]. In its amended complaint, FEC only claimed violations based on the **$55,601.35** in alleged cash contributions and dropped its claim based on the August 9, 2012 check for $13,824.85 from Florida Action Network ("FAN") to Expert Printing. *See* [DE 32-1 at 5]; [DE 41]. However, its motion for summary judgment claimed **$75,927.31** in alleged contributions. *See* [DE 142 at 14, 17, 23].

24.    *FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989).

30

## SUMMARY OF THE ARGUMENT

FEC's allegations do not state a cause of action for violation of FECA § 30122. FEC did **not** allege that Rivera "made" contributions **to FEC**; it alleged that Rivera "made" contributions **to the Sternad campaign.** FEC further alleged that Rivera openly "made" the payments **in his own name** to the same vendors he used on his campaign and that Sternad knew that Rivera made the payments. FEC's allegations regarding Sternad falsely reporting the source of the contributions to FEC is a red herring because § 30122 has nothing to do with reporting to FEC. Section 30122 only deals with "making" contributions **to the candidate/committee** in the name of another. By alleging that Rivera "made" and Sternad "accepted" Rivera's contribution **in Rivera's name** FEC plead itself out of the scope of § 30122.

After the district court rejected the "secondary liability" (i.e., "helping and assisting") theory asserted in FEC's original complaint, FEC's staff attorneys filed an amended complaint—without a vote of the Commissioners—alleging a purported "primary liability" theory based on a legal and factual position that was not part of FEC's presuit notice, probable cause, and conciliation procedures. FEC alleged a "knowing and willful" violation of § 30122 because it provides for an "enhanced" penalty of a mandatory minimum 300% and maximum of 1000% of the amount involved. *See* 52 U.S.C. § 30109(a)(6)(C). This resulted in the district court's

31

"discretionary" decision to order a 600% (i.e., $465,000) civil penalty – the highest non-corporate civil penalty in FEC history. *See* [DE 163]; [DE 179].

Rivera respectfully requests reversal and remand for entry of dismissal or final summary judgment for Rivera because: (1) FEC did not state a cause of action for violation of section 30122; and (2) the district court lacked subject matter jurisdiction due to FEC's failure to demonstrate that it was unable to correct or prevent the alleged violation through its mandatory jurisdictional pre-suit procedures. Alternatively, the district court erred in granting summary judgment for FEC based on hearsay, non-record material, and conflicting evidence. Lastly, Rivera seeks reversal of the $465,000 civil penalty because: (1) the 300–1000% penalty provision in FECA § 30109(a)(6)(C) is unconstitutionally vague and excessive; and (2) the civil penalty imposed by the district court was a punitive and excessive fine in violation of the Eighth Amendment.

## ARGUMENT

**I.    The trial court lacked subject matter jurisdiction because FEC did not establish that it was unable to correct or prevent a violation of § 30122 based on a "primary liability" theory prior to litigation.**

FEC cannot "institute a civil action for relief" unless it demonstrates that it was "unable to correct or prevent any violation of [FECA]" after complying with the following "jurisdictional requirements in the FECA that are prerequisites to filing this action":[25] (1) determine by vote that it has "reason to believe" that a person has committed, or is about to commit, a violation of [FECA]"; (2) notify the person of "**the alleged violation**" setting forth the "factual basis" for "**such alleged violation**"; (3) investigate "**such alleged violation**"; (4) notify the person (through general counsel) of any recommendation to vote on finding of probable cause including a brief stating "**the position**" of general counsel on the "legal and factual issues" of the case; (5) determine by vote that there is "probable cause" to believe that a person violated or is about to violate FECA; (6) attempt for least 30 days to "correct or prevent such violation by informal methods of conference, conciliation, and persuasion"; (7) attempt to "enter into a conciliation agreement with" the person involved that may require the person to pay a civil penalty based on "the amount involved in **the violation**"; and (7) vote to institute a civil action for relief, including

---

25.    52 U.S.C. § 30109(a)(6)(A); [DE 1 at 8-9] [DE 41 at 9]; [DE 171-10].

a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty based on the amount of any "contribution or expenditure involved in **such violation**." *See* 52 U.S.C. § 30109(a)(2)-(6) (emphasis added).

In this case, FEC's notices, probable cause determination, and conciliation attempts were all based on an invalid "helping and assisting" theory under a regulation that it has since repealed due to *Swallow*.  And FEC illegally communicated and attempted to conciliate with Rivera in violation of its no-contact rule. Thus, FEC's presuit procedures were defective and did not involve the theory and factual position asserted in the amended complaint that was filed by its staff attorneys without approval or a vote of the Commissioners. For these reasons, the district court should have denied leave to amend or dismissed the case for lack of subject matter jurisdiction.

A.  **FEC's presuit notices, probable cause determination, and attempts at conciliation were based on the invalid "secondary liability" theory asserted in its original complaint.**

"[W]here the FEC fails. . . to comply with the mandatory prerequisites to suit, an enforcement suit is premature, and the court, at a minimum, must stay the action pending cure by the FEC, or in certain cases dismiss the suit for want of **subject matter jurisdiction**." *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 18 (D.D.C. 1995) (emphasis added). Here, FEC did not comply with the

jurisdictional pre-suit requirements of § 30109 because it based its probable cause determination on an invalid and recently repealed regulation that expanded the scope of § 30122 to punish individuals for "helping or assisting" (i.e., "aiding or abetting") a person in making a contribution in the name of another person (i.e., "secondary liability"). The district court dismissed FEC's original complaint because it asserted the same invalid secondary liability theory – the same theory asserted in its **presuit probable cause determination**. [DE 31]. Thereafter, FEC's staff attorneys amended its complaint and significantly altered its factual position to assert a claim for "primary liability" against Rivera. *See* [DE 32]; [DE 32-1]; [DE 41]. But FEC's Commissioners never voted on whether probable cause existed to attempt to conciliate or to file a civil lawsuit alleging primary liability against Rivera. Moreover, FEC never provided notice that it intended to pursue a claim for primary liability and made no effort to conciliate the factual or legal issues of primary liability before alleging a violation grounded on primary liability in this lawsuit. Thus, FEC failed to comply with the jurisdictional presuit requirements. Even the district court rejected FEC's attempt [DE 30 at 2] to argue that its original complaint alleged both "primary" and "secondary" liability against Rivera. *See* [DE 31 at 5].

35

**B.    FEC illegally contacted, communicated, attempted to conciliate directly with Rivera rather than his designated counsel.**

FEC also failed to comply with the jurisdictional pre-suit requirements of § 30109 because its mandatory notices and communications violated 11 C.F.R. § 111.23 (the "no-contact" regulation). Specifically, FEC never sent the notices to Rivera's designated attorney and illegally communicated directly with Rivera during the conciliation process – including sending a subpoena and discovery requests solely to Rivera despite his designation of counsel. *See* [DE 171-4]; [DE 171-5]; [DE 171-6]; [DE 171-7; [DE 171-8]; [DE 172-1].  Throughout the presuit process, FEC **never** notified attorney Collazo that: (1) FEC's General Counsel intended to recommend a probable cause finding; (2) that General Counsel prepared a brief stating any legal and factual support for a probable cause finding; (3) that FEC made a probable cause finding; or (4) that FEC was contacting Rivera directly and urging him to sign a proposed conciliation agreement. FEC also sent a letter solely to Rivera and not his counsel asking him to sign a proposed "conciliation agreement" containing a litany of stipulations and admissions that—had Rivera signed it—could have exposed him to criminal prosecution. *See* FECA § 30109(d)(1)(A), (D). At the time of this no-contact violation, the five-year statute of limitations hadn't yet

expired.[26] Considering DOJ brought criminal charges against Sternad and Alliegro and conducted a grand jury investigation against Rivera in relation to this matter, *see* [DE 142-5], FEC's exclusion of Rivera's designated counsel from its eleventh-hour attempt to persuade Rivera to sign a self-incriminating document purportedly for the purposes of "settlement" and "conciliation" is particularly troubling.

Since FEC's proposed sanction was denominated as a "civil penalty" under FECA § 30109(a)(6)(C), Double Jeopardy would not have prevented DOJ from using Rivera's conciliation agreement against him to seek a subsequent criminal "fine" under the identical monetary super-penalty provision in FECA § 30109(d)(1)(D) – as well as a prison sentence.[27] The failure to communicate with Rivera through counsel rendered FEC's presuit procedures invalid. *See* 11 C.F.R. § 111.23; *see also* 28 U.S.C. § 530B ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."); 28 C.F.R. § 77.3; Fla. Bar R. 4–4.2 ("[A] lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter,

---

26.    *See* 52 U.S.C. § 30145; 18 U.S.C. § 3282; *see also* 28 U.S.C. § 2462; *FEC v. Toledano*, 317 F.3d 939, 948 (9th Cir. 2002).

27.    *See Hudson v. United States*, 522 U.S. 93, 98-99 (1997).

unless the lawyer has the consent of the other lawyer"); S.D. Fla. Local R. 11.1(c);

*Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, 861 F. Supp. 2d 1346 1358

(S.D. Fla. 2012).

**II.    FEC failed to state a cause of action because it alleged that Rivera "made" the contributions in his <u>own name</u> to the <u>Sternad campaign</u> and § 30122 has nothing to do with making false reports to FEC.**

FEC's allegations do not state a cause of action for violation of FECA § 30122. FEC did <u>**not**</u> allege that Rivera "made" contributions **to FEC**; it alleged that Rivera "made" contributions **to the Sternad campaign.** FEC further alleged that Rivera openly "made" the payments **in his own name** to the same vendors he used on his campaign. FEC's allegations regarding Sternad falsely reporting the source of the contributions to FEC is a red herring because § 30122 has nothing to do with reporting to FEC. Section 30122 only deals with "making" contributions **to the candidate/committee** in the name of another. By alleging that Rivera "made" and Sternad "accepted" Rivera's contribution **in Rivera's name** FEC plead itself out of the scope of § 30122.

Because § 30122 does not create civil liability for making false reports to FEC, the case law involving similar fact patterns is almost exclusively in the DOJ/criminal context where the § 30122 violations are connected to charges under 18 U.S.C. §§ 2, 371, and 1001. For example, in *United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994), DOJ pursued criminal charges against a person for making contributions

through straw donors. Because FECA's then 3-year statute of limitations had expired, DOJ brought the charges under 18 U.S.C. § 1001 for making false statements to the government. But, like FECA § 30122, that provision did not by itself provide for secondary liability. Thus, "[t]he government concede[d] that the false statements at issue here were the contributor lists submitted by various campaign treasurers to the Federal Election Commission." *Id.* "Defendant did not prepare or file such reports, and consequently, he did not make the false statements to the Commission." *Id.* "The defendant's conduct, therefore, did not fall directly within the scope of [18 U.S.C. § 1001]." *Id.* "To bridge that gap, the government used [18 U.S.C. § 2(b)] in conjunction with [18 U.S.C. § 1001] to charge defendant with causing the campaign treasurers to file false reports." *Id.*

Other cases have likewise determined that the duty to report is the pivotal factor in assessing direct liability for misrepresenting to the FEC. *See United States v. Trie*, 21 F. Supp. 2d 7, 14 (D.D.C. 1998) ("Because Mr. Trie did not make any representation or statement directly to the FEC and had no duty to disclose any facts to the FEC, he cannot be prosecuted directly under Section 1001. The government therefore has charged Mr. Trie with **aiding** and **abetting** the making of false statements by another, the Democratic National Committee, in violation of 18 U.S.C. § 2(b).")); *Repub. Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 406-07 (D.C. Cir. 1996) ("The law only requires political committees to ask donors for the

information; no federal law requires donors to report their name, address, occupation, and employer as a condition of supporting the political party of their choice."); *Citizens for Resp. & Ethics in Wash. v. FEC*, 316 F. Supp. 3d 349, 360 n.6 (D.D.C. 2018) ("The plaintiffs also alleged that four individuals associated with Crossroads GPS violated the federal criminal conspiracy statute, 18 U.S.C. § 371, by conspiring to prevent disclosure of the identities of the three categories of donors. The FEC has no jurisdiction over such criminal allegations and, consequently, the FEC's Office of General Counsel's (OGC) made no recommendation concerning the alleged violations of federal criminal law and only recommended that the FEC close the file as to the four individuals.").

In this case, FEC did **<u>not</u>** allege that Rivera violated the reporting requirements of FECA § 30104 or made false reports to the government in violation of 18 U.S.C. § 1001 or aided and abetted or conspired with Sternad to make false reports to FEC in violation of 18 U.S.C. § 2 or 18 U.S.C. § 371. Nor did FEC charge Rivera with exceeding contribution limits or making excessive cash contributions in violation of FECA §§ 30116 and 30123 . . . probably because such violations would have capped any civil penalty at 200% of the amount involved. *See* 52 U.S.C. § 30109(a)(6)(C); 11 C.F.R. §§ 110.1, 110.3, 111.24. Instead, FEC conducted presuit administrative proceedings and filed a civil action based on a finding of probable cause that Rivera knowingly "assisted" in making a false name contribution under

40

52 U.S.C. § 30122 as extended by 11 C.F.R. § 110.4(b)(1)(iii) (2012). *See* [DE 1]; [DE 171-5, 6, 7, 8]; [DE 172-1]. The trial court rejected this "secondary liability" theory based on *Swallow* which enjoined FEC from enforcing § 110.4(b)(1)(iii) because § 30122 does not create civil liability for "helping or assisting" (i.e., "aiding or abetting") making or accepting false name contributions.

The district court formulated its ruling based on its incorrect conclusion that § 30122 extends to FEC's claim that Rivera "directed" Alliegro to "direct" Sternad to misrepresent in his FEC reports that Sternad used his own personal funds to pay the vendors. *See* [DE 163 at 34] ("The uncontested testimonial evidence adduced in this case shows that Rivera **directed** Sternad to file false reports with the FEC.") (emphasis added). In 2002, Congress attempted to amend § 30122 to reach those who "**direct**, help, or assist" in making false name contributions. H.R. 8528, 117th Cong. § 354. But that legislation did not make it out of committee.

Further, the district court's order describes Rivera's involvement as instigating, initiating, soliciting, or participating in a scheme or conspiracy [DE 163] – which is exactly how FEC explained its invalid "helping and assisting" regulation. *See Swallow*, 304 F. Supp. 1113 ("In its 'interpretive guidance' for the new regulation, [FEC] explained that it applies to: those who **initiate** or **instigate** or have some significant **participation** in a **plan** or **scheme** to make a contribution in the name of another, including those who **solicit** or act as **go-betweens** to third parties

41

whose donations are reimbursed.") (quoting 54 Fed. Reg. at 34, 104-05 (1989)) (emphasis added). In *Swallow*, 304 F. Supp. 3d at 1117 n.1, the court recognized that section 30122 does not provide **civil** liability for aiding and abetting violations. "In contrast to the civil penalties under section 30122, in a section 30122 criminal case, secondary actors — those who aid and abet the person who illegally makes a contribution in the name of another . . . are subject to criminal liability. This is because the United States criminal code, 18 U.S.C. § 2, specifically makes such secondary actors 'punishable as a **principal**.' " *Id.* (emphasis added).

Thus, FEC did not establish that Rivera made a contribution in the name of "another" by allegedly directing Alliegro to direct Sternad to list vendor payments as loans to his own campaign. Only Sternad (as campaign treasurer) had a duty to report to FEC, and only Sternad made the false report to FEC. *See* FECA § 30104(a); *Curran*, 20 F.3d at 567. Without 11 C.F.R. § 110.4(b)(1)(iii), the only way to impute Sternad's false report to Rivera would be through criminal charges for making a false report under 18 U.S.C. § 1001 coupled with aiding and abetting under 18 U.S.C. § 2 or with conspiracy under 18 U.S.C. § 371.

42

**III.    The district court entered summary judgment for FEC based on hearsay, non-record material, and conflicting evidence.**

The record evidence did not support entry of summary judgment for FEC. In her declaration, Alliegro recanted her grand jury testimony that Rivera: (1) was the source of the funds paid to the vendors; and (2) suggested to her to instruct Sternad to report the vendor payments as loans from Sternad to his own campaign. Alliegro was the only witness claiming to have personal knowledge of these allegations. FEC admitted that Alliegro's declaration "recanted," "contradicted," and "conflicted with" her prior grand jury testimony and guilty plea. *See* [DE 58 at 2, 8-9, 15]; [DE 58-1]; [DE 65 at 2-3]; [DE 71 at 3, 5, 10, 17]. The rest of the evidence was all circumstantial and anecdotal accounts of Rivera's alleged general involvement and connection to the activities of the Sternad campaign. Some of the evidence was internally conflicting (such as the deposition testimony and declarations of Sternad and Borrero). The text message and call logs were not authenticated and did not establish a § 30122 violation. And, contrary to the district court's ruling, neither Alliegro nor Sternad testified that Rivera directed or instructed Alliegro to direct or instruct Sternad to make the false reports to FEC. Even if they did, it would not establish a basis for direct civil liability under § 30122 for the reasons stated *supra*.

The court also concluded that "Rivera has the ability to pay a $465,000 fine" based on: (1) a disclosure statement that Rivera submitted to qualify for the 2016

election reflecting what his self-reported net worth was seven years ago; (2) unsubstantiated allegations from a pleading in a separate lawsuit in New York about revenue that Rivera's business allegedly received in the past; and (3) the court's independent review of the Florida Division of Corporations website. *See* [DE 142–37, 163–164]. And, the court took issue with Rivera's defense against FEC's charges and improperly used it against him as its primary consideration in its analysis of the severity of the penalty. *See* [DE 163 at 37-38] ("First and foremost, as his filings in this case demonstrate, Rivera continues to refuse to take responsibility for his illegal conduct [and] continues to run for office."). Rivera was never charged or convicted of a crime related to FEC's allegations and was entitled to exercise his constitutional right to run for office. He was also "entitled to have the complicated statutory and regulatory issues in this case determined by a court." *FEC v. Kalogianis*, No. 8:06-cv-68-T-23EAJ, 2007 U.S. Dist. LEXIS 88139, at *19-20 (M.D. Fla. Nov. 30, 2007) (citing *FEC v. Friends of Jane Harman*, 59 F. Supp. 2d 1046, 1059 (C.D. Cal. 1999) (denying the Commission's contention that the defendants' "determined resistance to conciliation" should result in a significant financial penalty).

Because the evidence was not competent or sufficient to impose a civil penalty on Rivera, the court should have denied summary judgment and either conducted an evidentiary hearing (if the civil penalty was non-punitive) or submitted the issue to the jury (if the civil penalty was punitive).

44

**IV.    Section 30109(a)(6)(C)'s 300–1000% enhanced civil penalty is unconstitutionally vague and excessive**.

On its face, FECA § 30109(a)(6)(C) imposes an unprecedented 300–1000% penalty and provides no guidelines on how a trial judge is to decide within its broad range setting a mandatory **floor** at the equivalent of treble (i.e., punitive) damages. And, the "civil" penalty enhancement of FECA § 30109(a)(6)(C) is identical to its criminal "fine" provision under FECA § 30109(d)(1)(D) – and both apply solely to "knowing and willful" violations of FECA § 30122. In other words, FECA § 30109(a)(6)(C) essentially authorizes FEC to seek and obtain a criminal sentence (i.e., punitive fine) without the constitutional protections afforded to defendants in criminal prosecutions.

In *Yates*, Judge Tjoflat (concurring in part) contrasted the lack of standards for calculating civil penalties under the FCA with the specific standards created to calculate criminal fines under the sentencing guidelines. *See Yates*, 21 F.4th at 1325-26 ("[W]ithout a set of standards, the district court has unfettered discretion to impose any fine within the statutory range. And that makes imposition of such fines essentially unreviewable for us, except under the Eighth Amendment."). However, the "Opinion of the Court" did not decide that the FCA was facially unconstitutional for this reason because: (1) the appellant did not "base its Eighth Amendment challenge on the procedural claim that the FCA lacks standards"; and (2) the district court imposed the statutory minimum penalty and lacked authority to go below it

45

absent a constitutional violation. Since the district court did not choose a penalty somewhere above the minimum, its discretion did not come into play. *See Yates*, 21 F.4th at 1316 at n.9. Unlike the civil penalty at issue in *Yates*, the district court in this case did not select the minimum penalty allowed under FECA. Rather, the court exercised its discretion to approve FEC's random request for 600%. Accordingly, FECA's lack of standards is squarely at issue in this case. The civil penalty provisions of section 30109(6) are facially unconstitutional because they provide no standards to guide courts in selecting an appropriate percentage. In this case, neither FEC nor the court provided any specific explanation for why 600% was selected as the magic number for the civil penalty imposed on Rivera.

In his Motion, Rivera asserted a facial challenge to the 300–1000% penalty enhancement provision of 52 U.S.C. § 30109(6) as unconstitutionally vague, arbitrary, capricious, and excessive on its face because it lacks standards to guide its application. *See* [DE 179 at 2, 4, 15-16, 20]. FEC didn't dispute that the statute is silent on standards for selecting a percentage within the 300–1000% range. Instead, FEC invoked the "broad authority" of courts to fashion remedies for civil statutory violations. *See* [DE 189 at 11]. Citing the *Furgatch* "discretionary" factors, FEC claimed that courts supplied the standard. *See id.* However, the Ninth Circuit issued its decision in *Furgatch* in 1989, thirteen years before Congress enacted the 300–

1000% penalty multiplier.[28] *Furgatch* obtained the factors from this Court's decision in *Danube Carpet*,[29] which predated *Yates* and did not involve FECA or the 300–1000% penalty multiplier.

Moreover, FEC cited no other statutory provision that provides a range of penalties that has a mandatory minimum of treble damages and allows up to ten times the amount at issue. FEC mentions that the statute also provides for criminal penalties; however, as Judge Tjoflat noted in *Yates*, the criminal sentencing guidelines provide a standardized system for calculating the severity of the penalty based on research. *See Yates*, 21 F.4th at 1325-26 ("[W]ithout a set of standards, the district court has unfettered discretion to impose any fine within the statutory range. And that makes imposition of such fines essentially unreviewable for us, except under the Eighth Amendment."). By contrast, the most FEC can say for the 2002 McCain-Feingold amendments, including § 30109(6), is that they were a reaction to perceived threats of foreign influence in U.S. elections – factors not present in this case. *See* [DE 189 at 18]. FEC also advocated for a "strong presumption" in favor of the range selected by Congress. *See* [DE 189 at 13]. However, as Judge Newsom notes in his *Yates* concurrence, the Eighth Amendment was passed to limit Congress'

---

28.    *See* Pub. L. 107-155, 116 Stat. 81 (2002).

29.    *United States v. Danube Carpet Mills, Inc*., 737 F.2d 988, 993 (11th Cir. 1984).

authority to punish, and simply deferring to Congress "[s]eems a bit like letting the driver set the speed limit." *See Yates*, 21 F.4th at 1318 (Newsom, J. concurring). FEC claimed it was significant that the district court did not choose the **maximum** penalty. However, choosing the maximum penalty is fully exercising discretion to punish. By contrast, the *Yates* Court found it significant that the trial court selected the **minimum** statutory penalty. Because the trial court in *Yates* did not exercise its discretion to punish above the minimum, its discretion did not come into play and the facial invalidity of the statute was not at issue.

**V.    The district court's $465,000 civil penalty is an unconstitutional excessive fine under the Eighth Amendment.**

FEC pursued and the district court in its "discretion" imposed a punitive (i.e., criminal) excessive fine in violation of the Eighth Amendment. *See* [DE 163]; [DE 191]. In rejecting Rivera's Eighth Amendment challenge, the district court determined that it acted within its "discretion" in choosing a civil penalty at 600% of the amount of the alleged illegal contributions because this was within the 300–1000% range set by Congress in FECA § 30109(a)(6)(C) and because the court applied the 9th Circuit's *Furgatch*[30] factors used in other FECA cases. *See* [DE 191]. In its summary judgment order, the court expressed that "it is necessary for this Court to also bar [Rivera] from violating the statute" and "from engaging in similar

---

30.    *FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989).

unlawful conduct in the future" and that the court's remedies would "do the trick" in "convincing Rivera" to "stop violating the law." *See* [DE 163 at 38]. The court also expressed that the civil penalty would "vindicate the FEC's authority and strengthen its ability to enforce 52 U.S.C. § 30122." *See* [DE 163 at 37].

The Court's justifications reflect that the penalties imposed were at least partly penal in nature because they are grounded in the common law principles of punishment. *See Yates*, 21 F.4th at 1325 and n.4 ("In the criminal law, district courts impose fines based on a set of statutory standards, located in 18 U.S.C. §§ 3553(a) and 3572.3 These standards are Congress's codification of the traditional purposes of sentencing: general deterrence, specific deterrence or incapacitation, and retribution."); *FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 88, 99 (D.D.C. 2014) ("[T]he FEC argues that a penalty is necessary to **deter** similar violations and to **punish** defendants, noting that the purpose of a civil penalty is to **punish** culpable individuals, not just to restore the status quo. FEC Reply at 13") (emphasis added).[31]

Because the civil penalties are at least partially punitive in nature, the court should have applied this Court's Excessive Fines analysis to determine if the amount violates the Eighth Amendment. *See Yates*, 21 F.4th 1288 ("(i) whether the

---

31.    *Accord Furgatch*, 869 F.2d at 1259; *FEC v. Latpac*, No. 1:21-cv-06095, 2022 U.S. Dist. LEXIS 61125, at *11 (S.D.N.Y. Mar. 31, 2022); *FEC v. O'Donnell*, No. 15-17-LPS, 2017 U.S. Dist. LEXIS 59524, at *5-6 (D. Del. Apr. 19, 2017); *FEC v. Am. Fed'n of State, Cty. & Mun. Empls.-P.E.O.P.L.E. Qualified*, Civil Action No. 88-3208, 1991 U.S. Dist. LEXIS 15654, at *5 (D.D.C. Oct. 31, 1991).

defendant is in the class of persons at whom the statute was principally directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant.").

Under the *Yates* test, the amount of the fine is grossly disproportionate to the alleged offense. First, Rivera is not within the class of persons that § 30122 was principally directed. As explained supra, § 30122 provision is not directed at false reporting to FEC or making excessive cash contributions or excessive base contributions. And FEC did not allege that Rivera attributed the payments to someone other than himself in his direct and/or indirect interactions with Sternad and the vendors.

Further, this case did not involve allegations of a *quid pro quo*.[32] Rather, FEC alleged that Rivera made the payments to better his own campaign by weaking

---

[32]. The Supreme "Court has recognized **only <u>one</u>** permissible ground for restricting political speech: the prevention of '**quid pro quo**' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022). "Over time, various other justifications for restricting political speech have been offered—[1] equalization of viewpoints, [2] combating distortion, [3] leveling electoral opportunity, [4] encouraging the use of public financing, and [5] reducing the appearance of favoritism and undue political access or influence—but the [Supreme] Court has repudiated them all." *Wisconsin Right to Life State PAC v. Barland*, 664 F.3d 139, 153-54 (7th Cir. 2011). "Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others." *McCutcheon v. FEC*, 572 U.S. 185, 191-192 (2014) ("Many people might . . . be delighted to see fewer television commercials touting a candidate's accomplishments or disparaging an

Demorcatic frontrunner Garcia in the primary. According to FEC's allegations, Rivera was not endeavoring to get Sternad elected into office in exchange for promises of political favors from Sternad. Rather, FEC alleged that Rivera was paying the vendors to help get himself re-elected in the general election.[33] Further, there was only a generalized,[34] non-specific harm to the public because the alleged plan didn't prevent Garcia from winning the primary or defeating Rivera in the

---

opponent's character. Money in politics may at times seem repugnant to some, but so too does much of what the First Amendment vigorously protects.").

33.    *Cf. FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022) (the First Amendment "safeguards the ability of a candidate to use personal funds to finance campaign speech, protecting his freedom to speak without legislative limit on behalf of his own candidacy." (quoting *Buckley v. Valeo*, 424 U. S. 1, 54 (1976)); *see also Shrink Mo. Gov't PAC v. Maupin*, 892 F. Supp. 1246, 1255 (E.D. Mo. 1995) ([W]hile the Court might agree that negative campaigning is distasteful, that is not a sufficient basis for interfering with core first amendment rights."); *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1014 (9th Cir. 2003) ("[T]he First Amendment requires that politicians tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

34.    "Admittedly, there is always harm to the public when [the Act] is violated." *FEC v. Kalogianis*, No. 8:06-cv-68-T-23EAJ, 2007 U.S. Dist. LEXIS 88139, at *20 (M.D. Fla. Nov. 30, 2007) (quoting *FEC v. American Fed'n of State, County and Municipal Employees- P.E.O.P.L.E. Qualified*, 1991 U.S. Dist. LEXIS 15654, 1991 WL 241892 (D.D.C. Oct. 31, 1991)). "Nonetheless, in this instance any injury to the public is remote and circumscribed." *Id.* (imposing civil penalties on defendants for "making, consenting to, and accepting in-kind corporate contributions; and for falsely reporting the sources of two of the loans and the dates of repayment of two others").

general election. [DE 171-5 at 5 n.5].[35] Courts have generally taken a "hands-off" approach to passing judgment on so-called political "dirty tricks" in the absence of proof that the conduct violates a specific statute. *See Newsom v. Golden*, 602 F. Supp. 3d 1073, 1085 (M.D. Tenn. 2022).[36] Thus, all three *Yates* factors weigh against imposing a substantial fine under the allegations and evidence in this case. Certainly, imposing the largest fine in FEC history on a non-corporate individual is not sustainable applying *Yates* to the allegations and evidence in this case.

---

35.    *Cf. Gonzales v. Madigan*, 990 F.3d 561, 564 (7th Cir. 2021) ("Gonzales contends . . . that Rodriguez and Barboza were stooges put on the [Democratic primary] ballot by Madigan's allies to divide the Hispanic vote and ensure Madigan's victory. . . . We mean no disrespect to politicians in recognizing that many false statements are made during political campaigns and that many a stratagem that one side deems clever will be seen by the opposition as a dirty trick. Opposing political figures may brand true statements as false and honest campaigning as a rotten subterfuge. Voters rather than judges must decide when one side has gone overboard.").

36.    *Accord Reardon v. Danley*, No. 21-CV-2260, 2022 U.S. Dist. LEXIS 144883, at *40 (C.D. Ill. July 6, 2022); *Raila v. Cook Cnty. Officers Electoral Bd.*, No. 19 C 7580, 2021 U.S. Dist. LEXIS 215458, 2021 WL 5179913, at *4 (N.D. Ill. Nov. 8, 2021); *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 939 (7th Cir. 2018) ("Politics is a rough-and-tumble game, where hurt feelings and thwarted ambitions are a necessary part of robust debate. It is impossible to imagine the judiciary attempting to decide when a politically retaliatory step goes 'too far' without displacing the people's right to govern their own affairs and making the judiciary just another political tool for one faction to wield against its rivals. . . . The price of political dirty tricks must be collected at the ballot box rather than the courthouse."); *Manley v. Law*, 889 F. 3d 885, 889 (7th Cir. 2018) ("The Constitution does not guarantee good feelings or regulate manners in political disputes.").

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand for entry of dismissal or final summary judgment in Rivera's favor because FEC failed to comply with the jurisdictional presuit requirements under FECA § 30109(a)(4) and has neither alleged nor presented any evidence that Rivera violated FECA § 30122. Alternatively, the Court should reverse and remand for trial because the summary judgment evidence was inconclusive and precluded summary judgment for FEC. Lastly, the Court should reverse the $465,000 civil penalty as an unconstitutional excessive fine under the Eighth Amendment and because section 30109(a)(6)(C)'s 300–1000% civil penalty provision is unconstitutionally vague and excessive.

## CERTIFICATE OF COMPLIANCE

This document complies with the **type-volume limit** of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 12,882 words. This document complies with the **typeface requirements** of FRAP 32(a)(5) and the **type-style requirements** of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using

Microsoft® Word for Microsoft 365 MSO (Version 2304 Build 16.0.16327.20200)

64-bit in 14-point font and Times New Roman type style.

/s/ Thomas L. Hunker
Thomas L. Hunker
Dated: **June 14, 2023**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **June 14, 2023**, a copy of this document was

furnished by electronic filing with the Clerk of the Court via CM/ECF, to:

**Kevin Deeley, Greg J. Mueller, Lisa J. Stevenson,
Harry J. Summers, and Shaina Ward**
FEDERAL ELECTION COMMISSION
1050 First Street, NE, Washington, DC 20463
202-694-1650; 202-694-1553; 202-694-1566
gmueller@fec.gov; kdeeley@fec.gov; lstevenson@fec.gov;
hsummers@fec.gov; sward@fec.gov

Respectfully submitted,

/s/ *Jeffrey David Feldman*
**Jeffrey David Feldman**
Fla. Bar No. 330302
TRAILBLAZER
1200 Brickell Avenue
Penthouse 1900
Miami, FL 33131
305-222-7851
jfeldman@trailblazerlaw.com

/s/ *Thomas L. Hunker*
**Thomas L. Hunker**
Fla. Bar No. 38325
**V. Ashley Paxton**
Fla. Bar No. 1003907
HUNKER PAXTON APPEALS & TRIALS
1 EAST BROWARD BLVD, SUITE 700
Fort Lauderdale, FL 33301
877-841-8808
thomas.hunker@hunkerappeals.com
ashley.paxton@hunkerappeals.com
jodi.kain@hunkerappeals.com
tamara.mihajlovic@hunkerappeals.com

54